UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

**FRANK MITCHELL**                    **CIVIL ACTION NO. MJG-02-CV-4156**

**VERSUS**                              **JUDGE GARBIS**

**SMITHKLINE BEECHAM**
**CORPORATION D/B/A**
**GLAXOSMITHKLINE AND**
**DOES 1 THROUGH 100 INCLUSIVE**
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## AMENDED COMPLAINT

Plaintiff, Frank Mitchell, alleges upon personal knowledge as to himself and his own acts, and upon information and belief based on investigation of counsel as to all other matters, as follows:

## INTRODUCTION

1.    This is an action brought by Plaintiff who ingested the prescription drug paroxetine under the trade name "Paxil" and who, after December 29, 1992, suffered from Withdrawal Symptoms following reduction or termination of his dosage.  Defendants, SMITHKLINE BEECHAM CORPORATION D/B/A GLAXOSMITHKLINE ("SKB") and DOES 1 through 100, inclusive, (collectively "defendants") have aggressively marketed, advertised and sold to Paxil Plaintiff, wrongfully exposing him to certain harmful effects of Paxil which are, and at all times relevant herein were known to the defendants, but not fully and timely disclosed to the plaintiff, the medical community and/or the consuming public.  Thus, Plaintiff was deprived of full and informed consent in his usage of Paxil.

2.    This action is for monetary and injunctive relief to redress an ongoing consumer fraud perpetrated by defendants in violation of the Maryland Consumer Protection Act, Maryland Annotated Code, Commercial Law

Article, Title 13, Subtitle 3, (CPA) and Maryland Common Law.  Plaintiff brings this action to recover damages, restitution, refunds, and/or equitable, injunctive and declaratory relief against defendants, who tested, manufactured, labeled, marketed, distributed, prompted, advertised and sold the drug Paxil to the general public.

## THE PARTIES

3.     Plaintiff, Frank Mitchell, resides in Baltimore City, Maryland.  He has taken Paxil and experienced multiple withdrawal symptoms when decreasing his use of Paxil and attempting to discontinue his use of Paxil.

4.     Plaintiff is a victim of withdrawal, dependency, and/or addiction caused by defendants' antidepressant drug Paxil.

5.     The "Withdrawal Symptoms" experienced by plaintiff include one or more of the following symptoms:
Nausea, anxiety, sensory disturbances (including paraesthesia and sensation of cramps), headache, sweating , agitation, fatigue, tremor, sleep disturbances (including intense dreams), confusion, palpitations, insomnia, irritability, digestive disorders, and asthenia.

6.     Plaintiff was never fully informed before starting Paxil that it was addictive, induced dependency, or caused Withdrawal Symptoms of the types mentioned above when dosage was reduced or terminated.

7.     Plaintiff experienced dependence to the drug Paxil.  Upon reducing his dosage, plaintiff had no idea of the cause of his symptoms, other than knowing that he was very sick.

8.     Plaintiff was prescribed and took Paxil as recommended by defendants to Plaintiff's treating health care provider in accordance with prescribing information provided by defendants.

9.     Defendant SKB was and still is a corporation duly existing under and virtue of the laws of the State of Pennsylvania.  It is engaged in the business of manufacturing, promoting, distributing, marketing, advertising, and selling

pharmaceutical drugs, including Paxil. SKB is and at all relevant times was, doing business throughout the State of Maryland.

10. The names and capacities of defendants sued in this Complaint as DOES 1-100 inclusive, are currently unknown to plaintiff, who therefore sues such defendants by such fictitious names. Each of the defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein. Plaintiff will seek leave of the Court to amend this Complaint to reflect the true names and capacities of the defendants designated herein as DOES 1 through 100, inclusive when such identities become known.

## NATURE OF THE CASE

11. Since its introduction into the U.S. market on December 29, 1992, Paxil has been an antidepressant medication of the selective serotonin reuptake inhibitor ("SSRI") class, which as includes Zoloft (sertraline) and Prozac (fluoxetine).

12. Paxil has caused a material and substantial number of people who take it to experience serious and unexpected withdrawal reactions. These reactions are "unexpected" to the victims and even their health care providers because the defendants have deliberately or recklessly failed to properly warn about these reactions. Both health care providers and patients have and continue to unwittingly use Paxil without knowing the drug's addictive traits. Plaintiff, and his health care providers were never informed before starting Paxil that it was addictive, induced dependency, or caused severe withdrawal reactions in a large percentage of Paxil users when their dosage was reduced or terminated. In fact, to the contrary, SKB, in its advertising material, falsely stated and continues to falsely state that Paxil is not habit-forming or addictive and does not cause dependence.

13. Defendants have known for years the distinct characteristics of Paxil which make it prone to cause Withdrawal Symptoms after its use is reduced or discontinued. While the medical community has acknowledged the potential for all SSRI's to cause withdrawal reactions, Paxil is, by far, the worst.

According to World Health Organization ("WHO") data obtained by plaintiff, Paxil has the highest incidence rate of withdrawal adverse experiences of any antidepressant in the world.

14.    Paxil causes dependency as it is defined by WHO, which defines drug dependence as: "a need for repeated doses of a drug to feel good or to avoid feeling bad." (WHO Lexicon of alcohol and drug terms, 1994).

15.    Plaintiff, respectfully asks the Court to: (a) award damages; (b) award equitable, injunctive and declaratory relief; and (c) award all costs, including attorney's fees.

## FACTUAL ALLEGATIONS

16.    Plaintiff was prescribed and took Paxil as recommended by defendants and his treating health care providers. Plaintiff suffered Withdrawal Symptoms caused by Paxil.

17.    Defendants were and are at all times legally responsible for Paxil's labeling. This is notwithstanding that the FDA, as a federal regulatory agency, approves the labeling that is contained in a package insert for the drug and further published in the "Physicians Desk Reference" distributed to all health care providers in the United States. SKB, however, as with all drug manufacturers, is not permitted to invoke the FDA's regulatory role as an excuse for inadequate labeling. Moreover, each manufacturer is legally obliged to add strengthened and amplified labeling without FDA involvement when safety requirements dictate. In all jurisdictions, health care providers are entitled to legally rely on the manufacturer's labeling in prescribing drugs to their patients.

18.    Since December 29, 1992, Paxil's labeling has been legally deficient. Paxil's addictive qualities, its tendencies to induce dependency, and its dangerous traits in causing Withdrawal Symptoms when the patient reduces and/or abruptly terminates dosage were all facts known to defendants during this period, but never included in Paxil's label. As a result, all U.S. health care

providers, including plaintiff's health care providers, were ignorant of this danger. As a result of this gap in knowledge, health care providers prescribed Paxil to their patients and failed to warn plaintiff of the drug's danger. Plaintiff would have refused to take Paxil had he been properly advised of the true facts about the drug.

19. Between December 29, 1992 and the present, scientific literature published by medical researchers throughout the world documented Paxil's dangerous nature as herein described. Some of the key articles that the defendants failed to respond to, among many others, include the following:

a. In 1993, Stoker and Eric reported on the serious side effects attendant to paroxetine withdrawal at the American Psychiatric Association's annual meeting in San Francisco, May 22-27, 1993. The authors conducted 2 week tapering regimes for 186 patients 6 to 12 week double-blind comparative studies. During these tests, paroxetine patients fared badly. Both low-dose and high-dose groups were studied. Paxil's low dose group actually fared worse than the high does group, suffering 42% withdrawal rate, as opposed to 35% withdrawal rate in the high dose group. Both occurred notwithstanding the fact that a tapering regime was initiated during reduction of dosage. An imipramine patient group was also studied by Stoker and Eric. The imipramine group had a lower incidence of withdrawal than either paroxetine group. This report occurred 5 months after Paxil entered the U.S. Market.

b. In 1993, the Committee on Safety of Medicines ("CSM"), Great Britain's counterpart to the FDA, reported 78 cases of withdrawal after discontinuation of paroxetine, reporting that "such reactions have been reported more often with paroxetine than with other SSRI's." (Current Problems in Pharmacovigilance" (1993;19:1)). Defendants refused to react to this warning.

c. In 1994, Barr and colleagues reported that a staggering 50% of paroxetine patients suffered withdrawal syndrome despite the fact that

the suffering patients tapered dosage of the drug over a 7-10 day period; (Am J Psychiatry 151;2, February, 1994).

d.    In 1994, Keuthen and colleagues reported on Paxil withdrawal, indicating that paroxetine "has been reported to cause such reactions more than other SSRI's." The percentage of Paxil patients with obsessive compulsive disorder ("OCD") adverse effects was 38.5%, and such reactions appeared notwithstanding a tapering down regimen. Patients affected reported dizziness, ranging from "mild to severe." (J Clin Psychopharmacol 1994; 14:206-7).

e.    In 1995, Oehrberg and colleagues reported that 34.5% of paroxetine patients reported adverse events on discontinuation, most commonly dizziness – compared to only 13.5% of placebo patients. (British Journal of Psychiatry 1995; 167: 374-379).

f.    In 1996, Bhaumik & Wildgust reported on Paxil Withdrawal, indicating that paroxetine "has been reported to cause such reactions more than other SSRI's."

g.    In 1996, Coupland and colleagues reported that withdrawal occurred on SSRI reduction of dosage "despite slowly tapered withdrawal." The authors warned that SSRI withdrawal occurs more frequently with short half-life SSRIs such as paroxetine and fluoxamine than with Zoloft or Prozac. Paxil patients suffered tremendous withdrawal reactions in these studies. Of Paxil's 50 patients suffering withdrawal, 16% suffered dizziness, 12% suffered parasthesia, 12% suffered lethargy, 6% suffered nausea, 2% dysphoria, 4% anxiety, 4% vivid dreams, 4% insomnia, 16% movement related adverse symptoms, and 20% suffered more than one of these adverse events. (J Clin Psychopharmacol 1996 Oct; 16(5): 356-62).

h.    In 1996, Nuss and Kinkaid studied serotonin discontinuation syndrome, and paroxetine patients in particular. The authors concluded that "with the advent of the . . . [SSRI], there is now growing evidence to support a 'discontinuation syndrome' associated

with withdrawal of therapy." (W V Med J 2000 Mar.-Apr; 96(2):405-7).

i.   In 1996, Price and colleagues reported on the British data base of adverse effects on withdrawal for SSRI medications. By far, paroxetine was the largest inducer of withdrawal. The most prevalent reactions cited were dizziness, paraesthesia, tremor, anxiety, nausea, and palpitation. The authors stated that while the overall safety profiles of the SSRI's were similar, "withdrawal reactions with paroxetine constitute a greater (5.1%) proportion of reports than with other SSRI's (0.06% to 0.09%)." (Br J Clin Pharmacol 1996 Slec; 42(6): 757-63).

j.   In February, 1996, Australia's "Adverse Drug Reactions Advisory Committee" ("ADRAC") published results of a study showing that Paxil had the highest rate of SSRI withdrawal adverse events in that country. Even though Zoloft outsold Paxil in Australia, the latter had more than three (3) times the number of adverse complaints as Zoloft. Complaints on Paxil exceeded Prozac by a rate of greater than 4 to 1.

k.   In 1998, Dr. Roger Lane's article, Withdrawal Symptoms after discontinuation of selective serotonin reuptake inhibitors (SSRI's), was published in the Journal of Serotonin Research (1996, 3, 75-83). After listing the physical symptoms caused by withdrawal, Dr. Lane observed that all of the SSRI's, paroxetine caused severe withdrawal symptoms the most often.

l.   In 1997, Dr. Haddad reported that the highest incidence of continuation reactions among the SSRI's was paroxetine. (J Clin Psychiatry 1997; 58 Supp 17:17-1; discussion 220).

m.   In 1997, Lejoyeux and colleagues provided extensive review of the literature on antidepressant discontinuation, concluding that "they . . . [withdrawal symptoms] . . . are much more common with the shorter acting SSRI's such as paroxetine, than with the longer acting agent fluoxetine. Because the symptoms of antidepressant discontinuation

include changes in mood, affect, appetite, and sleep, they are sometimes mistaken for sign of a relapse into depression." (J Clin Psychiatry 1997; 58 Supp 17: 11-5). Defendants did nothing in response to this article.

n.   In 1997, Mackay and colleagues reported on British experienced with SSRI's, reporting on a study done by the Drug Safety Research Unit, Burlsedon Hall, Southhampton. A patient population of 13,741 was screened. It was concluded that "[w]ithdrawal symptoms were significantly more frequent with paroxetine than the other three SSRI's." The report indicated "agitation, anxiety, tremor, dizziness, loss of balance, nausea, vomiting, paraesthesia, and restlessness are all associated with withdrawal." (Pharmacoepidemiology & Drug Safety, 1997; 6:No 4. 235-46). In late 1997, defendants falsified the results of this study. In an internal document, defendant's corporate leadership fabricated the results of this British study and told defendants' sales representatives in the United States that the British study showed that all of the SSRI's were the same with regard to withdrawal. This false message was sent to the sales representatives for the express purpose of conveying this misrepresentation to all physicians in the United States. On information and belief, plaintiffs allege that this false message was, in fact, delivered to United States physicians from late 1997 to the present.

o.   In 1997, Rosenbaum and colleagues reported on the clinical management of antidepressant discontinuation. They indicated that antidepressant agents with shorter half-lives should be tapered gradually, and cited paroxetine in that category. Moreover, the authors recognized the serious diagnostic problem: "symptoms of discontinuation may be mistaken for physical illness or relapse into depression . . . misdiagnosing the symptoms may lead to unnecessary, costly test and treatment." (Journal of Clinical Psychiatry 1997; 58 Supp. 7: 37-40).

p.    In 1997, Stahl and seven (7) colleagues documented Paxil's leading withdrawal status in the world.  The authors investigated and reported upon the WHO database.  From the year of introduction for each of the SSRI's, all case reports for Paxil, Prosac, and Zoloft were retrieved.  Sales figures were also retrieved.  Paxil's rate of withdrawal reactions was higher than Prosac and Zoloft for each of the 16 countries surveyed, and also for those countries for which a detailed analysis was conducted (U.S., U.K., and Australia). (Eur J Clin Pharmacol 1997; 53(3-4): 163-9).

q.    Also in 1997, Young and Currie of Newcastle reported on their survey indicating that a sizable minority of health care providers were aware of the existence of antidepressant withdrawal reactions.  This included psychiatrists, 28% of whom expressed no awareness that antidepressant medications could induce discontinuation reactions.  The conclusion of the authors was that "education about discontinuation reactions . . . is needed for both psychiatrists and family practice physicians." (J Clin Psychiatry 1997; 58 Suppl. 7:28-30).  Defendants disregarded this study by insisting that all health care providers understand "discontinuation" and that no further labeling on Paxil or withdrawal was needed.

r.    In 1998, Dr. Thompson of Southhampton reported on withdrawal reactions in antidepressant medications, citing paroxetine, fluoxetine, and sertaline.  He discussed emerging complications in this medical area and their relevance. (J Clin Psychiatry 1998 Oct; 59 (10): 541-8).

s.    In 2000, Bellouf and colleagues reported paroxetine withdrawal syndrome on their patient population.  (Ann Med Interne (Paris) 2000 Apr; 151 Suppl. A: 52-3).

t.    Black and colleagues reported on SSRI discontinuation syndrome and proposed diagnostic criteria, further indicating that "paroxetine was the most frequently implicated" of the SSRI's. (J Psychiatry Neurosci 2000 May: 25 (3): 255-61).

u.    In 2000, Dr. Haddad sounded the alarm on professional unawareness of the serious withdrawal problem, stating that there is widespread "misdiagnosis of antidepressant discontinuation symptoms" and that "increased professional awareness of discontinuation symptoms is necessary to prevent misdiagnosis and inappropriate treatment." (Acta Psychiatry Scand 200 Dec; 102(6):466-7; discussion 467-8).

v.    In 2000, Hindmarch and colleagues concluded, with respect to a study involving four SSRI's, that cognitive and psychomotor performance was adversely affected after treatment was interrupted over 4-7 days. Particular cited was paroxetine, in which it was stated that abrupt discontinuation of treatment with paroxetine led to deterioration in various aspects of health and functioning. The authors made clear their opinion that Paxil was the worst of all, stating that these effects "are not evident in patients receiving (Prozac), (Zoloft) and (Celexa), suggesting that they are not an SSRI class phenomenon." (Int Clin Psychopharmacol 2000 Nov;15(6):305-18).

20.    Of all the pharmaceuticals in the SSRI class, Paxil, as reported within the scientific literature, is consistently listed as the worst offender in matters of withdrawal, dependency, and addiction. These dangerous characteristics, listed earlier in the complaint, appear in a large percentage of Paxil patients reducing and/or terminating dosage/and are both physical and psychological in nature.

21.    Defendants were legally responsible for monitoring the scientific literature referenced in the previous paragraphs, and taking corrective action to modify Paxil's deficient label. However, defendants failed to take any action to warn the public of Paxil's dangers, which defendants improperly categorized as a "discontinuation" issue, until December 14, 2001. Even in the label modified as of December 14, 2001, the "discontinuation" warning is legally insufficient.

22.    A principal reason for Paxil's sudden and severe withdrawal problem is the drug's short "half-life" (the length of time it takes for a drug to leave the

body).  Paxil's half-life is 24 hours.  By contrast, Prozac, one of Paxil's competitors in the SSRI arena, has a half-life of several hours.  While Paxil is said to be favored over Prozac in some aspects of psychopharmacology, Prozac clearly has an advantage over Paxil as to addiction, dependency, and withdrawal.  However, owing to defendants' aggressive suppression of Paxil's addictive characteristics over several years, this fact is not well known, even among medical practitioners.  In fact, in a recent survey published in the Harvard Mental Health Letter dated February 2001, it was disclosed  that as many as 75% of non-psychiatric physicians were unaware that Paxil can cause dependency/withdrawal reactions or how to properly diagnosis the associated symptoms.

23.    Viewed as a "competitive" matter with Prozac, the half-life issue was fraudulently exploited by defendants.  In 1997, the Drug Surveillance Research Unit ("DSRU"), an official British entity, concluded a study of 13,741 patients who had been treated with SSRI's.  Upon conclusion, the study's authors officially reported in the scientific literature that although all SSRI's showed a similar incidence of adverse events overall, Paxil was the worst offender in causing withdrawal.  Viewing this as a "competitive" issue with Prozac and another SSRI, Zoloft, defendants' corporate leadership directed its sales force to falsify the DSRU study.  All sales personnel were directed to promulgate to health care providers in every in every state that the DSRU study showed all SSRI's induce the same rate of withdrawal.  On information and belief, that fabrication reached most of the health care providers for which it was intended.

24.    Defendants have repeatedly defrauded the American public by flooding the airways and health care providers' offices throughout the country with false information on Paxil.  One of defendants' TV commercials promoting Paxil for "generalized anxiety disorder" ends the ad by proclaiming "Paxil is not habit forming."  This claim is blatantly false.  Another example of defendants' misinformation campaign is a glossy colored pamphlet distributing by the thousands in health care providers' offices in every jurisdiction containing the

statement that Paxil's side effects "may cause mild, usually temporary, side effects in some individuals." Defendants know this statement to be false. Defendants knew Paxil causes severe side effects in a substantial number of individuals, and that the drug's addictive and dependency and withdrawal-inducing qualities effectively "hooked" many patients for years, such that many are never able to come off the drug.

25.    Defendants have and continue to directly deceive the public on Paxil clinical studies as they pertain to addiction, dependency, and withdrawal. In the same glossy style pamphlets noted above, defendants asks the following question: "Can I Become Addicted to Paxil?" Defendants then answer that question with the following: "Paxil has been studied both in short-term and long-term use and is not associated with dependence or addiction." The answer is false and misleading because it suggests that the studies systematically probed the dependency and addiction issue, and that Paxil came up clean. That is false. No studies were conducted as acknowledged by defendants in their label for Paxil which states:

> DRUG ABUSE AND DEPENDENCE. Physical and Psychological Dependence: Paxil has not been systematically studied in animals or humans for its potential for abuse, tolerance, or physical dependence. While the clinical trials did not reveal any tendency for any drug seeking behavior, these observations were not systematic and it is not possible to predict on the basis of this limited experience the extent to which a . . . (central nervous system) . . . active drug will be misused, diverted and/or abused once marketed. Consequently, patients should be evaluated carefully for history of drug abuse, and such patient should be observed closely for signs of Paxil misuse or abuse (e.g., development of tolerance, increments of dose, drug seeking behavior).

26.    The above prescribing information and labeling is false and misleading on its face.

27.    In fact, after representing to the FDA that Paxil has been "systematically tested" for withdrawal and that the tests were successful, Paxil was approved for marketing in the U.S. However, at that time and prior thereto, defendants knew of the withdrawal problems with Paxil (particularly from its clinical trials, including those held in Yugoslavia). Subsequent to obtaining its marketing approval from the FDA based on its "systematic testing," defendants made an "about face" which is evidenced by the above prescribing information and labeling.

28.    Evidence of defendants' knowledge of the withdrawal reactions their drug was causing can also be found in a report to Dr. Martin Brecher of the FDA which disclosed subjective reporting from patients by clinical investigators who told defendants' management that Paxil was dangerously addictive. A group of 108 patients ending their participation in a trial told defendants that Paxil had caused them to suffer "withdrawal" reaction ("Group of 108 Complaining Patients Study"). Out of the 1923 patients in that trial, the 108 complaining patients constituted 8.3% of participants. Defendants deliberately and improperly reclassified these patients' withdrawal reactions as "relapse" symptoms. However, "relapse" is not "withdrawal." Relapse occurs when a patient has improved his/her depressive state, and then reverts back to a more seriously depressed state. Symptoms exhibited during relapse are qualitatively different from the reactions exhibited during withdrawal. As indicated elsewhere in this complaint, it is alleged on information and belief that defendants, over the years, deliberately mischaracterized numerous patients' withdrawal reactions as relapse symptoms. Defendants did this in order to gain and maintain FDA approval for Paxil and avoid revealing the drug's withdrawal problems.

29.    Notwithstanding defendants' knowledge of the withdrawal reactions associated with Paxil from its pre-FDA approval clinical trials and its post-marketing nine (9) years of Paxil experience with the general patient population, defendants have done nothing about it. Defendants have been

consciously indifferent to the problem in order to preserve its profits of nearly $2.5 billion a year, and to further increase its market share.

30.    Defendants' continued advertising on print, radio, and television regarding Paxil's short "half-life" induces both health care providers to believe that Paxil has no withdrawal reactions or dependency problems. In public promotion programs, defendants assert that Paxil's short "half-life" does not affect the therapeutic process and reduces side affects. As a result, more and more patients are being prescribed Paxil and are getting "hooked" on the drug. The list of patients addicted to Paxil grows daily.

31.    Despite the extensive documented history of withdrawal reactions and dependency/withdrawal symptoms associated with Paxil and an ever increasing number of Paxil withdrawal complaints, defendants adopted a policy of strategic ambiguity to downplay withdrawal syndrome associated with Paxil. The policy is a public relations ploy. The strategy recognizes that certain code words must be placed in the public arena to make it appear that defendants are confronting Paxil safety issues forthrightly. This strategy is a fraud on its face. There is no word "discontinuation" in the medical dictionary. All medical dictionaries properly define "withdrawal" as the operative word to describe the condition. The American Psychiatric Association, the official authority on diagnosing such symptoms, likewise specifies "withdrawal" as the proper word.

## COUNT I

**Violation of the Maryland Consumer Protection Act, Maryland Annotated Code, Commercial Law Article, Title 13, Subtitle 3, *et. seq.***

32.    Plaintiff repeats and realleges each and every allegation contained above with the same force and effect as is fully set forth herein.

33.    At all times relevant, the Maryland Consumer Protection Act ("CPA") was in effect. The CPA forbids unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

34.    Plaintiff is protected by CPA.  Defendants are engaged in the business of manufacturing, promoting, distributing, marketing, advertising, and/or selling pharmaceutical drugs including Paxil in the State of Maryland.

35.    Defendants continuous practices of false and misleading advertising, constitutes unfair and deceptive practices in violation of CPA, Title 13, Subtitle 3, et. seq.

36.    By the acts and course of conduct engaged in by defendants, plaintiff has suffered an ascertainable loss and will continue to be injured as a proximate result of defendants' unfair and deceptive trade practices, in that, among other things:

    a.    Plaintiff paid for products when defendants were knowingly mischaracterizing the Withdrawal Symptoms occurring during clinical trials so as to reduce the number of recorded occurrences of withdrawal reactions.

    b.    Plaintiff paid for products that he would not have purchased had defendants not violated CPA; or

    c.    Plaintiff paid a price he would not have paid had defendants not violated CPA.

37.    Based upon defendants' misrepresentations and omissions and wrongful conduct, plaintiff was induced to purchase Paxil, and as a result was injured and suffered damages in an amount to be determined at trial.  In addition, plaintiff is entitled to injunctive relief, reasonable attorneys' fees, and court costs.

WHEREFORE, plaintiff prays judgment against defendants as set forth herein.

## COUNT II

### Breach of Warranty

38.    Plaintiff repeats and realleges each and every allegation contained above with the same force and effect as is fully set forth herein.

39.    At all times herein mentioned, defendants utilized FDA proceedings, packaging, promotional activities and materials, and the advertising media to urge health care providers, such as plaintiff's, to prescribe Paxil, and patients, such as plaintiff, to purchase and use Paxil.  Defendants expressly warranted to health care providers, to plaintiff, and to the general public, that Paxil's association with "drug dependency" and "withdrawal syndrome" were "rare." As a result, plaintiff's health care providers prescribed Paxil without any warning to the patients that Paxil could cause drug dependency and withdrawal syndrome.

40.    Defendants represented to the consumers who would use Paxil and to the physicians who would prescribe it – without full and complete disclosure of the risks of Paxil's side effects – that Paxil would not create drug dependency and that "withdrawal syndrome" was "rare."  This amounts to an express warranty.

41.    Defendants, knew, or in the exercise of reasonable diligence should have known, that Paxil has serious side effects and can cause serious withdrawal reactions and dependency/withdrawal syndrome and that the occurrences are not "rare," but rather frequent.

42.    Plaintiff and his health care providers relied on express warranty representations of defendants, in use of Paxil, but defendants breached their warranty because Paxil can and frequently does cause withdrawal reactions and dependency/withdrawal syndrome.

43.    As a direct and proximate result of the breach of express warranty by defendants, plaintiff sustained damages and other losses according to proof.

WHEREFORE, plaintiff prays judgment against defendants as hereinafter set forth.

## COUNT III

### Fraud and Fraudulent Misrepresentation

44.    Plaintiff repeats and realleges each and every allegation contained above with the same force and effect as if fully set forth herein.

45.    Defendants have since December 29, 1992, defrauded the medical profession
in general and plaintiff's health care providers in particular, and the Paxil
patient population in general and plaintiff in particular, in that they, among
other acts and/or omissions:

a.    Knowingly mischaracterized and miscoded withdrawal syndrome
occurring during the clinical trials so as to reduce the number of
recorded occurrences of withdrawal reactions;

b.    Failed to inform the medical community that a significant number of
individuals taking Paxil during foreign clinical trials experienced
dependency/withdrawal syndrome;

c.    Knowingly misrepresented and continues to misrepresent that its
clinical trials and investigations adequately tested for withdrawal
syndrome;

d.    Knowingly claimed that Paxil's withdrawal problems were a relapse,
when in fact they were not;

e.    Actively deceived plaintiff by representations in written labeling, oral
communications and advertising suggesting that Paxil is not habit
forming, that it is not addictive, that it does not cause physical or
psychological dependency, and that it would not cause withdrawal
reactions if dosage were reduced or terminated;

f.    Answering the question: "Is Paxil addictive?" with the response:
"Paxil has been studied both short-term and long-term use and is not
associated with dependence or addiction;"

g.    Implementing false and misleading techniques to hide linkage between
dependency/withdrawal syndrome on one hand, and Paxil on the other.
After censoring the word "withdrawal" from company files and
instructing its agents similarly, defendants began to dilute the medical
vocabulary by using misleading medical terms to substitute for
withdrawal such as "discontinuation syndrome;"

h.    Over-promoting Paxil in order to increase its sales at the expense of
revealing the truth about the addictive/dependency nature of Paxil;

i.    Fraudulently conveyed to all health care providers in the U.S. that Paxil's side effects were only "mild," when in fact defendants knew many of the drug's withdrawal side effects were severe;

j.    Fraudulently conveyed to all health care providers in the U.S. that a British study involving 13,741 patients illustrated that all of the SSRI's exhibited a similar rate of withdrawal reactions, when in fact defendants knew that study illustrated Paxil to have the highest rate of withdrawal reactions among SSRI's as recorded and reported by the authors;

k.    Knowingly misrepresenting that Paxil is not habit forming when in fact defendants know the drug induces dependency and "hooks" many patients; and

l.    Knowingly engaging in deceptive and fraudulent practices while marketing Paxil in violation of the common law in every jurisdiction in the United States.

46.   As the result of the above, each and every day, tens, if not hundreds, of patients are becoming involuntary addicted/dependent upon Paxil because of defendants' false and misleading representations found in both print and electronic media and/or defendants' material omissions.  Hence, immediate injunctive relief is required to preclude the imminent and irreparable harm to these individuals and the general public.

47.   As a result of defendants' fraudulent acts and omissions as set forth herein, defendants have deceived the medical community, including plaintiff's physicians, into believing Paxil does not have the addictive qualities and does not cause dependency/withdrawal syndrome which the defendants know it in fact does.

48.   When said representations were made by defendants, they knew those representations to be false, or in the alternative, willfully and wantonly and recklessly disregarded whether the representations were true.  These representations were made by said defendants, with the intent of defrauding and deceiving the public in general and the medical community and to induce

the medical community to recommend, prescribe, and dispense Paxil and for the public to take it.

49.    At the time the aforesaid representations were made by defendants and at the time that plaintiff ingested Paxil, both plaintiff and his prescribing physicians were unaware of the falsity of said representations and reasonably relied on defendants' assertions, promulgated through its aggressive sales force to plaintiff's health care providers as set forth herein, that the drug was safe. In reliance upon said representations, plaintiff's health care providers did prescribe Paxil and plaintiff was induced to and did take Paxil. Had plaintiff known of the actual damages of Paxil, through his physician or otherwise, he would not have ingested Paxil.

50.    Defendants' motive of deliberating failing to advise health care providers and the public of the adverse effects that can lead to withdrawal problems (and that it knew a percentage of users of the drug inevitably would experience) was for financial gain and its fear that, if properly labeled, Paxil would lose its share of SSRI market through the efforts of competing manufacturers who would adversely compare Paxil's half-life to their own. Defendants' goal, at the expense of those who took its drug Paxil, was for Paxil to become the dominant SSRI on the market.

51.    At all times relevant herein, the conduct of defendants as set forth hereinabove, was malicious, fraudulent and oppressive toward plaintiff and the public generally, and defendants conducted themselves in a willful, wanton and reckless manner as set forth hereinabove. Despite its specific knowledge as set forth above, defendants deliberately recommended, manufactured, produced, marketed, sold distributed, merchandized, packaged, promoted and advertised the dangerous and defective drug Paxil. All of the forgoing constitute an utter, wanton and conscious disregard of the rights and safety of a large segment of the public, and by reason thereof, defendants are guilty of reckless, willful and wanton acts and omissions which evidence a total and conscious disregard for the safety of plaintiff which proximately caused the injuries as set forth herein.

52.    As a proximate result of defendants' fraudulent acts and omissions, and due to Paxil's addictive qualities, inducement of physical and psychological dependency, and inducement of dependency/withdrawal syndrome, plaintiff acted to his detriment in purchasing and ingesting Paxil, which he would not have purchased or ingested had he been told the truth about, and should be reimbursed what he spent.  Additionally plaintiff unexpectedly suffered prolonged physical and mental anguish, harm, and suffering and have sustained damages and other losses in an amount to be proven at trial.

WHEREFORE, plaintiff prays judgment against defendants as set forth herein.

## COUNT IV

### Negligence

53.    The allegations of each of the proceeding and subsequent paragraphs are incorporated by reference as if fully set forth herein.

54.    Defendants owed plaintiff a standard of care to ensure that plaintiff and his health care providers were adequately warned of Paxil's addictive qualities and dependency/withdrawal characteristics before the drug was prescribed. Defendants breached their duty to exercise that standard of care through their active misrepresentations and failure to warn.

55.    As a proximate result of defendants' breach of duty and due to Paxil's addictive qualities, inducement of physical and psychological dependency, and inducement of withdrawal syndrome, plaintiff proximately suffered prolonged physical and mental anguish, harm, and suffering and has sustained damages and other losses in an amount to be proven at trial.

WHEREFORE, plaintiff prays judgment against defendants as set forth herein.

## COUNT V

### Breach of Implied Warranty

56.    The allegations of each of the preceding and subsequent paragraphs are incorporated by reference as if fully set forth herein.

57.    Defendants, through Paxil's labeling, implied that Paxil was at least fit for the ordinary purposes as stated in its labeling.  It was not because the promises and affirmations on the labeling stated that drug dependency and withdrawal syndrome were "rare."  That was false.  They are frequent, thus victimizing plaintiff.  Accordingly, the implied warranty was breached.

58.    As a direct and proximate result of the breach of implied warranty by defendants, plaintiff sustained damages and other losses according to proof.

WHEREFORE, plaintiff prays judgment against defendants as hereinafter set forth.

## COUNT VI

### Strict Liability

59.    The allegations of each of the preceding paragraphs are incorporated by reference as if fully set forth herein.

60.    At all times herein mentioned, defendants knew or should have known that Paxil was and is addictive and causes dependency/withdrawal syndrome.

61.    At all times hereinafter mentioned, the vast majority of the members of the general medical community and members of the general public were unaware of the withdrawal dangers existing with respect to the use of Paxil.

62.    Paxil was used by plaintiff in the manner and amounts in which the defendants intended it to be used.

63.    At all times material hereto, in the United States, Paxil was not properly labeled by defendants.  In fact, it was mislabeled and was not accompanied by proper warning stating that Paxil can cause withdrawal reactions and dependency/withdrawal syndrome.

64.    Defendants promoted and maintained Paxil on the market both to physicians and directly to patients/consumers with the knowledge of Paxil's unreasonable risk to the public in general, and specifically to plaintiff.

65.    Paxil, as used by plaintiff, was defective and unreasonably dangerous when sold by defendants, and defendants are strictly liable for the injuries arising from its manufacture and plaintiff's use.

66.    As a direct and proximate result of the foregoing, plaintiff sustained damages and other losses according to proof.

WHEREFORE, plaintiff prays judgment against defendants as hereinafter set forth.

## COUNT VII

### Injunctive and Equitable Relief

67.    The allegations of each of the proceeding and subsequent paragraphs are incorporated by reference as if fully set forth herein.

68.    As a direct and proximate result of defendants' actions and/or omissions and conduct as set forth above, plaintiff has become "hooked" on Paxil.  He has become dependent upon Paxil and suffers withdrawal reactions whenever he tries to stop using the drug.  This harm to his health can only be mitigated by the creation of a fund to provide for injunctive and equitable relief, among other things:

a.    Provides a centralized clearing house to maximize the accumulation of accurate information concerning dependency/withdrawal reactions caused by Paxil;

b.    Provides a central location of accurate information that plaintiff's health care providers can resort to in diagnosing and treating Plaintiff and other patients who are experiencing Paxil-induced dependency/withdrawal reactions; and

c.    Provides a centralized information center that evaluates and disseminates all such information to plaintiff and his physicians.

69.    Plaintiff is at risk of misdiagnosis and unwarranted medical treatment because of the general ignorance about Paxil-induced dependency/withdrawal reactions.

70.    Plaintiff has no adequate remedy at law in that monetary damages alone will not compensate him for the continuing nature of the harm to him, and the equitable and injunctive relief proposed herein may prevent undue health risks.

71.    Without a court-approved injunctive and equitable relief that gathers and disseminates accurate information to health care providers, plaintiff may not receive prompt and proper medical care.

WHEREFORE, plaintiff prays judgment against defendants as hereinafter set forth.

## COUNT VIII

### Refund/Restitution Relief .

72.    The allegations of each of the proceeding and subsequent paragraphs are incorporated by reference as if fully set forth herein.

73.    As a direct and proximate result of defendants' actions and/or omissions and conduct as set forth above, plaintiff is entitled to an award of a refund, restitution and incidental economic losses, including the purchase price paid by plaintiff in connection with his purchase of Paxil.

WHEREFORE, plaintiff prays judgment against defendants as hereinafter set forth.

## PRAYER

WHEREFORE, plaintiff prays judgment against defendants as follows:

1.    For entry of an order requiring defendants to refund and make restitution of all monies acquired from the sales of Paxil to plaintiff;

2.    For damages in an amount to be determined at trial, and awarding prejudgment interest at the maximum rate allowed by law;

3.       For prejudgment and post-judgment interest as allowed by law;

4.       For reasonable attorneys' fees, accountants' fees, and other experts' fees;

5.       For the costs of their suit;

6.       For such further relief as this Court may deem just and proper; and

7.       For a trial by jury.

By: _____

Christopher L. Coffin
Patrick Pendley
Pendley Law Firm
PO Box Drawer 71
24110 Eden Street
Plaquemine, Louisiana 70765
(225)687-6396
FAX (225)687-6398

Robert J. Tully, Esq.
Tully, Webster & Francomano
1433 S. Hanover Street
2nd Floor
Baltimore, MD  21230
(410)727-3385
FAX (410)727-3318

Karen Barth
Mary Schiavo
BAUM, HEDLUND, ARISTEI,
GUILFORD & SCHIAVO
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025
(310)207-3233
FAX (310)820-7444

Donald J. Farber
LAW OFFICES of DONALD J. FARBER
7 Mt. Lassen Drive, Suite B-126
San Rafael, CA 94903
(415)472-7181
FAX (415)472-7182

I certify that a copy of the
foregoing pleading has been
sent to all opposing counsel

October 1, 2, 03